And we will hear from you, Mr. Fishwick, when you are ready. May it please the Court, Your Honor, Scott Fishwick on behalf of Petitioner Appellant Ivan, excuse me, Ivan Johnson. Your Honor, the issue before the Court today is whether Chambers v. Mississippi required at Mr. Johnson's trial for first-degree murder the admission into evidence of the confession of a third-party non-defendant, Donnie Massini, that he, and not Mr. Johnson, was responsible for the murder of Doug Keefer. So the State Court reviews Chambers and finds, I don't like factors, but finds a number of points in Chambers. And I want you to start with the corroboration issue because, to be honest, the autopsy in this case seems more corroborating of the State's theory to me than it does of anything Mr. Johnson is trying to say. Most of the impressions found are consistent with fist contact. There are two linear things, that they could be a shoe just as much as a bat. And when you add that to the testimony of the person who went and stayed at the house until the wee hours of the morning, I just find it hard to see this as evidence that was enough to be brought in, particularly over the objection of the ordinary evidentiary rules. Right, Your Honor. Dr. Bloom, who was the, I don't know what his title was, but he was the man who performed the autopsy, found that there were two linear contusions on Doug Keefer's body that, although they could have been caused by a shoe or even potentially a fist, they were more likely to have been caused by some sort of linear object. Well, he says linear object, but I understand he says the overwhelming number of contusions appear to be from fists. And then there are these other two things, but he's quite clear that it could be a shoe too. I mean, the edge of some shoes, I don't know what kind of shoes people were wearing then, but certainly the edge of some sorts of shoes that you might be wearing in late November in Northern Illinois could leave a linear mark. So where's the, why is the state court so off base in saying that this isn't corroborating? Well, you know, in addition to Dr. Bloom, there was some internal corroboration here. Donnie Mussini, when he made this confession in prison, made it at a time when the news of the killing had not become public. He also had an... You're talking about the statement of the cellmate, but the state court's worried about that because the cellmate's just kind of this random person. It's not, as in chambers, somebody who was well known to the defendant. Right, but it was made, you know, I don't think that one factor is dispositive. It was made... No one factor is dispositive. I agree with you on that. But the thing is, you're saying that the way the state court in this instance applied chambers was an unreasonable, I mean, recognizes chambers is there. We don't have a contrary to case, but was an unreasonable application. And then, of course, when you dig back into what unreasonable means, it's a high bar. Right. I understand that. And so I think, you know, this court addressed the limiting principles of chambers in the Cooch case not too long ago, and, you know, the court found that there are a variety of lessons that can be applied to cases like this, recognizing that, you know, none of these cases are going to be black or white, and they're always going to come down to a variety of factors. And I think when you go through those lessons that this court recently found, they all point in favor of admitting Messini's confession. So if you just start, you know, with the list here, the first is that the cases all involve murder and a substantial sentence. Here we have a first degree murder case. Mr. Johnson was convicted at the age of 19 and sentenced to 35 years in prison. He was basically a child at the time of his conviction. There was no evidence in the record that he was, you know, engaged in this conspiracy to deal drugs. But let's, I mean, at the root, we're talking about something that's so essential and something that's so reliable that the due process clause itself overrides the state's interest in ordinary enforcement of its evidentiary rules. And you know, the state court seems to have thought, and again, I can't say that they seem so wrong about this, that this story about hiring two men to go kill this guy with is basically not terribly persuasive. He's been beaten, his body is found in exactly the same place in the backyard where the eyewitness saw it there. The timing is weird, the autopsy doesn't help. Getting to reliability that's so strong that it should override what the state court thought is a tall order. Your Honor, I would suggest that reliability and plausibility are two different things. And what you're talking about sounds to me like implausible. Well, it's both, really. I mean, I do confess that I find the baseball bat story a little crazy, in light of the evidence. You know, it's not crazy in the abstract, but in light of the eyewitness. I'm sorry to interrupt, but I think to find that story crazy, the first thing you need to do is credit all of the prosecution's witnesses. And I don't think there's any basis to do that. Well, who says the body didn't lie there in the backyard all night? You know, he admits that he beat up Mr. Kiefer. He admits that there was a non-fatal physical altercation. Exactly. So, he himself agrees that we get to the point where Kiefer's lying down in the backyard. And there he is, the next, or what's left of him, the next morning. Right. But to get between the fight and the next morning. So, some guy came along with a baseball bat and pounded him. The only evidence we have is from this woman, Marie Schlosser, who witnessed the fight and then testified that she came back to the house at 2 a.m. and saw the body, supposedly, in the same spot. She never contacted police. She may have had a motive to lie. I mean, you have to credit that testimony. I mean, she was involved in this drug-dealing conspiracy from the beginning. Another of the state's witnesses, I believe his name was Vernon Williams, but I'm not sure if that's correct, a friend who came over and stayed the night, he testified at trial that he was actually asleep. So, you know, if two men came over and struck Doug Kiefer with baseball bats twice while Kiefer's friend was asleep, it's totally possible that he would not have woken up. So I think, you know, I think to credit this theory that, oh, it's totally implausible, you first have to, you know, credit all the witnesses at trial, and then you get into whether there's an element of arbitrariness to credit all of the prosecution's witnesses, but to, you know, immediately question the one piece of persuasive evidence that Mr. Johnson tried to admit that would support his theory of the defense. Right. This may be a persuasive argument if we had plenary review here, but we don't. You have to filter this through 2254D and the extremely deferential standard. Even if it's incorrect and the evidence should have been admitted, you've got a higher bar to... Right. I made the argument in my briefs that, you know, this should be a case for de novo review because the Illinois appellate court reviewed this under an abuse of discretion standard, and I believe that the proper standard here would have been for them to review the issue of Illinois evidentiary law first under an abuse of discretion standard, and then to the extent that Chambers applies, it would have taken the next step of deciding, nevertheless, you know, whether Chambers compels the statement's admission, and I think the state court only did the first step here, which is pretty evident in their brief, so I think they applied the wrong standard. I don't think they understood the nature of the Chambers claim, despite the fact that they cited it, and for that reason, I think that we're outside of ad ped deference here on this appeal. Okay. You can save your last minute. Mr. Schneider? May it please the court, counsel, my assistant attorney general, Josh Schneider, on behalf of the respondent. Just as a brief initial matter, the state appellate court's decision is reviewed under § 2254D's standard for reasonableness, and the use of the term abuse of discretion in the appellate court's opinion doesn't change that. The appellate court stated up front that it reviews trial court evidentiary decisions for abuse of discretion, and then it did a Chambers analysis, it cited Chambers, went through the Chambers factors, concluded that the statement was not reliable enough for it to have to be admitted under Chambers, that the trial court had not abused its discretion by excluding it. That is exactly the same approach this court has taken in similar cases, and this court certainly was not reviewing Illinois state evidentiary rules in those cases. Would you agree, Mr. Schneider, that Messina's statement had indicia of reliability? It was made spontaneously shortly after the incident occurred, before the public knew of the murder. It was incriminating, it was against penal interest, and of course, Messina was available for cross-examination. Shouldn't it have been given to the jury, and the jury could have decided how much weight they wanted to give it? No, Your Honor, and the reason is that the right to present a defense is balanced against the interests, I believe it was in Crane v. Kentucky, the Supreme Court said, well, we also need to consider the interest in preserving the integrity of the adversary process, under which only reliable evidence is presented, and unreliable evidence is excluded, and what constitutional state hearsay bar needs to be sufficiently reliable and critical to the defense, and Chambers, although it identifies four factors, what it does for the purposes of application to other cases that are not factually identical is it sets the threshold for reliability, the threshold that the evidence must meet for admission over the state evidentiary bar. And so when you're going through the Chambers factors, it's not an exercise in nose-counting, but it's rather a fairly substantial application of judgment, because whether, if you look at the first factor, was the statement made spontaneously to a close acquaintance shortly after the crime, well, how spontaneously, how close an acquaintance, right, how shortly after the event, because all of those three parts of that first factor admit to a wide range of answers, and depending on where you fall in the spectrum of any one of those things, it will provide a more or less persuasive assurance of trustworthiness. And ultimately, that's what Chambers asks us to do, is to look at the totality of the circumstances and see whether the aggregate, all of the assurances of trustworthiness are sufficiently persuasive to reach the threshold established in Chambers. And here, fair-minded jurists could certainly disagree that the assurances of trustworthiness provided by the various considerations in this case met the threshold in Chambers. So that first factor, was it made to a close acquaintance spontaneously shortly after? Well, it was made presumably after the crime. We don't have anything in the record saying exactly when it was made, but it was made to a cellmate. And as the state court noted, there's nothing in the record to suggest the cellmate was of any particularly close acquaintance. We don't know how long they were cellmates for, we don't know if they discussed personal matters, we don't know anything about the relationship at all, and it's certainly reasonable to find that that first factor provides a less persuasive assurance of reliability than did the first factor in Chambers, where the statements were made to close friends immediately after the crime and the morning after the crime. Moving on to the second factor, corroboration. Obviously, there are different degrees of corroboration. In Chambers, it was really an extraordinary degree of corroboration. There was the, in addition to the number of confessions, of hearsay confessions, there were three. There was also the declarant's sworn written confession and an eyewitness testimony that he had actually shot the victim that you've seen with a gun immediately after the shooting, that he owned a gun of the type used to commit the shooting. Here the evidence is essentially that Massini said that he had hired two guys with bats to kill Kiefer. Kiefer was subsequently beaten to death, and then that's the end of it. The physical evidence is far more consistent with the testimony not only of Schlosser but of Petitioner. The medical examiner said that the evidence was that Kiefer's wounds and cause of death were consistent with having been beaten while standing, then falling to the ground and being beaten while prone, which is exactly what Petitioner himself testified to on the stand. The corroboration here is far less persuasive than that in Chambers, and to the point that, while it wasn't publicized in the newspaper until later the following Tuesday, that doesn't mean that Kiefer's death was a secret from the community. I can see that as a good argument for Menon, but Massini, I don't know whether it's that evening after Johnson beats up Kiefer or the next morning. I can't tell when this statement is made inside the cell. No, and there was no proffer made as to when it was made. Because if it's made early enough, then it really is before other people would know. If it's made by 10 o'clock the next morning, maybe word is starting to spread somehow. Had Menon been brought in to testify, and he said, I was told Saturday night, one in the morning I was told this, then that would have been more strong corroboration, that this was something that only the killer could know. But that's not in the record. All we have is that he was told sometime before he was released at 9am on the following Tuesday. Which means that we have this universe of people who knew about the death on Monday morning. We have all the police who responded. Everyone in the community was canvassed by the police because they went door to door asking for information. We know that Schlosser and Jennifer, who she returned to the scene with shortly later to see if Kiefer had really been killed, they both knew that he'd been attacked. The other thing is that the Whitetide County- Didn't they all wander by this body? I mean, it really seems- It's in the backyard. It's in the backyard, and it's only walled off by police tape. So anyone who wanders by sees it. The Whitetide County Jail is not an information-tight environment. Every police officer who takes someone they've arrested on Saturday to the jail, if the police officer knew about it, they could have told someone at the jail, the person they bring could have told the jail, although it wasn't in the local newspaper. The local hard copy newspaper is no longer the only way that people get their crime information. Certainly the local television news could have covered the murder on Monday night, and who knows whether there was a television on at the jail, or whether there was a television on somewhere else in the community, and then someone called Masini and said, oh, this person that you had some sort of personal connection with- It's a lot of speculation, isn't it? It is, and unfortunately, we're stuck with the record we have before us. And that was the record that the State Appellate Court had. I'm sorry. That's okay. This was hard for you, I know. This was a murder case, you know, with substantial penalties at risk. Isn't it the Koops case that instructs us that in such cases, the defendant's interest in evidence is at its peak, and the balance should weigh in favor of admission of evidence? Well, Koops discusses chambers and the subsequent line of cases, Green and Crane and Rock and so on. Ultimately, what Koops holds is that the evidence that was excluded in Koops was both reliable and critical to the defense. And that's exactly what chambers requires. It says that the evidence must be at least this tall to ride. The evidence must be at least this reliable for admission. And in Koops, the court held that that evidence was unusually reliable and was also critical to the defense. And do you believe that in this case, that the evidence in Mussini's statement would not have been critical? In this case, they would not have been critical. The distinction between this and Koops is Koops, the case, was entirely circumstantial. And though, of course, circumstantial evidence can be sufficient to prove guilt beyond a more vulnerable to being undermined if one can challenge one of the links in the circumstantial chain. So in Koops, the question was whether he had murdered the victims within this relatively narrow window. And the excluded evidence would have conclusively proved that they were not murdered within that window. Here, Petitioner testified that he attacked Kiefer, and I may finish my thought very briefly. Certainly. And then said on the stand, quote, I wasn't trying to murder Doug Kiefer. And it was all a mistake and an accident, end quote. That's certainly powerful evidence that he committed the crime. And so there was not a reasonable likelihood that the excluded statement by Mussini could have affected the outcome of the trial. Those are reasons we ask that you affirm the district court. Thank you. Thank you, Mr. Schneider. Anything further, Mr. Fishwood? Thank you, Your Honor. Just on the issue of corroboration and reliability, I want to look back at Koops for a minute because in that case, Amanda's statement was not corroborated by anything other than her mother's statements that were consistent with nine-year-old Amanda's statements. So I think in our case, we have far more corroboration than even in Koops. We have the linear contusions, and we have the fact that this statement was made before news of the murder had become known. We have the map that was drawn and given to Mannion. We have the motive, the fact that Mussini had fired a gun at Kiefer approximately two months before Kiefer's death. So there's a lot more corroboration going on in this case than even Koops. On the issue of whether Mussini could have gotten news of Kiefer's death, I mean, there's absolutely nothing in the record that would suggest that this information made its way into the jailhouse and that Mussini got a hold of it. So I'd have to agree with Judge Romner that that's just pure speculation, and I don't think we should give that any weight. And lastly, I just want to point out that Mussini and Mannion were both available to be cross-examined, and I think, you know, if you look at Chambers itself, McDonald, the killer in Chambers, had repudiated his confessions, but the court gave a lot of weight to the fact that he would be available for cross-examination, that the jury would have a chance to view his demeanor when he was being questioned about that repudiation. So I think the same logic applies here. Okay. Thank you. Thank you very much. And you were appointed as well, were you not? I was. We appreciate your help very much. Thank you. And thanks as well to the state. We will take the case under advisement, and the court will be in recess. Thank you.